# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

DRAHCIR S. PARSON,

                    Plaintiff,

      vs.                                        9:14-CV-1268
                                                       (MAD/ATB)

SGT. WAYNE FARMER, et al.,

                    Defendants.

DRAHCIR S. PARSON, Plaintiff pro se
GREG T. JOHNSON, Esq. for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this amended civil rights complaint, plaintiff alleges that the defendants Farmer, Spring, and Smith used excessive force against him on September 10, 2014, while he was incarcerated at the Warren County Correctional Facility ("WCCF"). (Amended Complaint ("AC") at 2-4) (Dkt. No. 18). Plaintiff also alleges that defendant Gates later ignored plaintiff's complaints. (AC at 3). Plaintiff seeks substantial monetary relief. (AC at 6).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 31). Plaintiff has not filed any response to the defendants' motion, despite being informed of the possible consequences of his failure

to do so.[1] (Dkt. No. 31 at 2).  Defendants have filed a letter-motion requesting that the court grant defendants' summary judgment motion as "unopposed."[2] (Dkt. No. 34).  For the following reasons, this court will recommend granting the defendants' motion on the merits and recommends dismissal of the complaint.

## DISCUSSION

## I.  <u>Facts</u>

In his amended complaint, plaintiff alleges that on September 10, 2014, at approximately 10:15 a.m., he "refused to be stripped [sic] searched upon returning from court." (AC at 2).  He claims that his refusal was based upon "gay threats by the officers at that time." (*Id.*)  Plaintiff states that he was then surrounded by "at least five corrections officers" who were approaching him while putting on "gloves." (AC at 3).  Plaintiff states that he interpreted this action to mean that they were about to "forcefully rip [his] clothes off." (AC at 3).  Plaintiff states that there was no "other communication," and that the defendants "aggressively and excessively" assaulted him

---

[1] Attached to defendants' "Notice of Motion" is the "Notification of the Consequences of Failing to Respond to a Summary Judgment motion." (Dkt. No. 31 at 2-3).  One of those consequences is that the "Court may deem you to have admitted the Defendants' factual statements. (Dkt. No. 31 at 2-3).

[2] Although plaintiff's failure to oppose the defendants' motion may result in his admission of the facts as stated by defendants, the court must still ensure that the defendants' facts, as established, meet their burden to show that they are entitled to judgment as a matter of law. *See Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014) (a non-response to a summary judgment motion does not risk default because the district court must ensure that each statement of material fact is supported by the record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed) (citing *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242-46 (2d Cir. 2004) (even when a motion for summary judgment is not opposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law)). Thus, regardless of plaintiff's failure to respond, the court must consider the merits of defendants' motion.

when defendants Dustin Spring and Wayne Farmer tackled him, pushing him off a stool, and defendant Spring slammed his head into the floor.[3] Plaintiff states that he "believes" that defendant Farmer twisted plaintiff's ankle with the intention of breaking it. (*Id.*) Plaintiff claims that he was then placed in a mechanical restraint chair and "choked" by defendant Smith for approximately "six to eight minutes," after he had already been restrained in the chair. (*Id.*) Plaintiff states that this will all be shown on the "video." (AC at 2).

Plaintiff states that he was given medical attention within one half hour, but he was kept strapped in the chair for "hours with a bag over [his] head" and "little air space to breath [sic]." (AC at 3). Plaintiff states that defendant Gates came "about forty-five minutes later ignoring my complaint." (*Id.*) The amended complaint also contains a lengthy discussion, accusing defendant Gates and defendant Smith of assaulting another inmate by choking him and "smashing" his head against the wall because he refused to sit down when told to do so. (AC at 3-4). Plaintiff claims that they put the other inmate in the mechanical restraint chair and moved plaintiff to a different cell. (*Id.* at 4). Plaintiff claims that both he and the other inmate ultimately ended up in keeplock. Plaintiff claims that defendant Smith wrote a false misbehavior report against the other inmate, alleging that the inmate "swung at him with clenched fist," but there was no mention of the inmate's refusal to sit down. (*Id.*)

---

[3] Plaintiff first states that he was slammed into the floor head-first, then he states that defendant Spring was the one "who initially slammed me on my head along with Sgt. Farmer by pushing me/tackling me off the stool." (AC at 3).

Plaintiff states that he was "notified that night"[4] that he would not be getting his hour of recreation, personal telephone call, personal property, running water, the ability to flush the toilet, or bedding until 10:30 p.m. lockdown. (*Id.*) Plaintiff alleges that he had no "hygiene," toothpaste, soap, toilet tissue, or pen "(only at certain times)." (*Id.*) Plaintiff claims that he had to sleep with his head next to the commode, which contained feces and urine in it until after breakfast the next morning, when he was allowed to flush the toilet and wash his hands. He was allegedly denied a shower for two days, and a "cuff and shackle" order was imposed, meaning that he was required to be cuffed and shackled whenever he did anything, including using the Lexis/Nexis computer, making it "hard to utilize and take notes."[5] (*Id.*)

The amended complaint contains three "causes of action." (AC at 5-6). Plaintiff alleges "excessive force" by defendants Farmer, Spring, and Smith. (*Id.* at 5). Plaintiff also states that his "conditions of confinement" constituted "punishment," in violation of his due process rights. (*Id.*) Finally, plaintiff seems to allege that defendant Gates was "deliberately indifferent" to plaintiff's mental health and safety by failing to properly train and supervise the officers who "actually participate[d] in the excessive

---

[4] None of the named defendants appear to have been involved in this "notification" or any resulting deprivation.

[5] The amended complaint also contains random facts, alleging that another "video" will show that on "November 6," plaintiff was told to shut his door all the way by Officer Hill, who was training Officer Reid. (AC at 5). Neither of these officers are defendants in this action. Plaintiff claims that "due to the threats of putting semen in [sic] food," he went on a hunger strike for four days on September 25, 2014 and was afraid to eat the food at WCCF since that time. Plaintiff states that he filed grievances regarding the denial of legal research, access to courts, and denial of stamps and envelopes "to no avail." However, none of the named defendants are alleged to have been involved in any of these random acts.

4

force against "inmates" in WCCF.

## II.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,* 2006 WL 1133247, at \*3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

III. **_Heck v. Humphrey_**

    A.    **Legal Standards**

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a section 1983 action, seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared

invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87. This is referred to as the "favorable termination rule." In *Edwards v. Balisok*, 520 U.S. 641 (1997).

## B. Application

In support of their summary judgment motion, the defendants have submitted copies of documents reflecting the crimes with which plaintiff was charged, and those to which plaintiff pled guilty after the incident. (Def.s' Ex. C) (Dkt. No. 31-4). Plaintiff pled guilty to Assault with intent to cause physical injury in violation of N.Y. Penal Law § 120.00(1), a misdemeanor.[6] (Dkt. No. 31-4 at 5). Defendants argue that plaintiff's conviction for assault precludes this section 1983 action. However, the law is clear that even a plaintiff's conviction for assault would not necessarily preclude an excessive force claim against the officers, because the fact that plaintiff assaulted an officer does not preclude a reasonable jury finding that the force used during the incident, or after the incident, was excessive under the circumstances. *See Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 542-43 (S.D.N.Y. 2005) (citing *Sales v. Barizone*, No. 03 Civ. 6691, 2004 WL 2781752, at *13-14 (S.D.N.Y. Dec. 2, 2004)). *See also Brooks v. Brennan*, No. 9:12-CV-624, 2014 WL 697530, at *6-8 (N.D.N.Y. Dec. 9, 2014) (adopting Rep. Rec.) (neither collateral estoppel, nor *Heck* barred inmates

---

[6] Plaintiff was charged, first by Felony Complaint and then by indictment with Assault, Second Degree    a class D felony, in violation of N.Y. Penal Law § 120.05(3) (involving injury caused to a peace officer, police officer, or prosecutor in the course of his or her lawful duties); Assault, Second Degree    a class D Felony, in violation of N.Y. Penal Law §120.05(7) (this section of Penal Law 120.05 involves an assault while in a correctional facility); and Obstructing Governmental Administration, Second Degree    a class A misdemeanor, in violation of N.Y. Penal Law § 190.05. (Dkt. No. 31-4 at 3-4) (Indictment).

excessive force claim, notwithstanding his conviction for assault).

In this case, a finding that the force used by defendants was excessive would not necessarily invalidate the plaintiff's misdemeanor conviction in which he conceded that he intended to injure defendant Spring by grabbing his arm and pulling him over. The facts of this incident did not end with the injury to defendant Spring, and the other defendants could have conceivably used excessive force after plaintiff became "compliant."[7] Thus, the claim would not be barred by *Heck.* However, this court concludes, based on the video evidence, the medical evidence, and the affidavits filed by defendants, that plaintiff was not subjected to excessive force under the circumstances. As discussed below, the plaintiff's claim fails on the merits.

## IV. <u>Excessive Force</u>

### A. **Legal Standards**

The right of a pretrial detainee to be free from excessive force *amounting to punishment*, is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which relates only to convicted prisoners. *Murray v. Johnson No. 260*, 367 F. App'x 196, 198 (2d Cir. 2010); *Vazquez v. Curcione*, No. 11-CV-443, 2013 WL 5408858, at *3 (W.D.N.Y. Sept. 25, 2013) (citing inter alia *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)). Even though pretrial detainees are protected by

---

[7] For instance, plaintiff alleges that the defendants "choked" him for an extended period of time after he was strapped into the restraint chair. Whether that statement has any merit will be discussed below, but it would not necessarily affect plaintiff guilty plea, in which he presumably conceded that he intended to injure defendant Spring when the incident began. The court in *Jeanty* also rejected the defendants' argument that collateral estoppel would preclude plaintiff's section 1983 claim. 379 F. Supp. 2d at 544. In addition, the court does not have a transcript of the plea colloquy, so it is not clear what facts the plaintiff admitted during the plea.

8

Due Process, the Second Circuit has equated the legal standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment with the standard used to analyze convicted inmates' Eighth Amendment claims. *Id.* (citing *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999)). The Second Circuit has held that a pretrial detainee may also set forth a constitutional due process violation by showing that the defendants conduct constituted "pre-conviction 'punishment' or involved an 'intent to punish.'" *Id.* (quoting *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001)).

In *Murray v. Johnson*, the Second Circuit stated that the due process inquiry is articulated in the excessive force analysis under the Eighth Amendment in *Hudson v. McMillian*, 503 U.S. 1 (1992). *Id.* *Hudson* provides that both an objective and a subjective element must be satisfied to establish an excessive force claim. *Id.* at 49. To satisfy the objective element, the plaintiff must show that the resulting harm or deprivation was sufficiently serious. *Id.* (citing *Walsh*, 194 F.3d at 50). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Walsh*, 194 F.3d at 47-48 (quoting *Hudson*, 503 U.S. at 7-10) (citations omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

9

and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### B. Application

In support of their motion for summary judgment on the merits of the excessive force claim, defendants have filed several exhibits in addition to plaintiff's criminal records, including a video tape recording of the incident, excerpts from the plaintiff's testimony at his December 15, 2014 N.Y. Gen. Mun. Law § 50-h examination,[8] affidavits from the individual defendants, nurses' notes written immediately following the incident, and documents showing plaintiff's substantial disciplinary history while incarcerated at WCCF. (Dkt. No. 31-2–31-14).

The court has carefully reviewed the video tape of the incident, together with the defendants' affidavits and plaintiff's own testimony from the section 50-h hearing and concludes that the defendants acted reasonably in the circumstances in subduing plaintiff and in holding him until he was placed in the restraint chair. In his affidavit,

---

[8] Under the New York General Municipal Law ("GML"), when a notice of claim is filed against a municipality (NYGML § 50-e), the municipality "shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made." NYGML § 50-h(1). The examination is upon oral questions, unless the parties otherwise stipulate. *Id.*

defendant Dustin[9] Spring states that on September 10, 2014, at approximately 10:09 a.m., he was assigned to the desk area in the Booking Room at WCCF. (D. Spring Aff. ¶ 4). At that time, plaintiff was returning from an appearance at the Warren County Court. (*Id.*) The policy at WCCF is that, upon returning to the facility from an "outside and unsecure" location, a "same gender strip search" is conducted in a "private and discreet" location off the booking area. (Captain Michael Gates Aff. ¶ 8) (Dkt. No. 31-9). Plaintiff was well aware of the strip search policy because he had been through the procedure several times "without incident." (*Id.*) Plaintiff testified at his 50-h hearing that he had been through "thousands" of strip searches at various facilities, including upon his initial entry into WCCF on March 23, 2014. (Hearing Transcript ("HT") at 13-14, 70). He testified that there was nothing inappropriate about his initial strip search at WCCF. (*Id.* at 13-14). He also testified that he was never touched during any of the strip searches at WCCF, nor was anything offensive ever said to him. (HT at 97).

On September 10, 2014, plaintiff was "on full cuff and shackle order" due to threats he had made to staff and due to a prior incident in which he assaulted a female corrections inspector. (D. Spring Aff. ¶ 4). Upon entering the booking area, plaintiff was instructed by Officer Smith and Officer Green to sit by the "inmate phone next to the Live Scan machine." Plaintiff asked Officer Green what would happen if he refused

---

[9] There are two Officer Springs who have submitted affidavits in this case. (Dkt. Nos. 31-11 and 31-12). Officer Dustin Spring is one of the defendants herein and is a Corrections Officer at WCCF. (Dkt. No. 31-12, "D. Spring" Aff.) Sergeant Barrett Spring is not a defendant in this action, but was present in the booking area at the time of the incident. (Dkt. No. 31-11, "B. Spring" Aff.) The current defendants are Gates, Farmer, Smith, and Dustin Spring. Although present during the incident, plaintiff has not named Officer Green or Sergeant Barrett Spring. Both of these officers have filed affidavits in support of the summary judgment motion. (Dkt. Nos. 31-11, 31-13).

to be strip searched.  Officer Green explained that a strip search was required in order to enter the facility, to which plaintiff replied, "*Fuck it then I am refusing to be strip searched.  Now what are you gonna do about that.*"[10] (*Id.*) (italics in original).

Defendant Spring states that while plaintiff was seated and waiting his turn[11] to be searched, he continued to state that he was not going to comply with the search requirements. (D. Spring Aff. ¶ 5).  Based on what defendant Spring referred to as plaintiff's "tirade," defendant Spring notified defendant Farmer.  Shortly thereafter, defendant Farmer and Sergeant Barrett Spring responded to the booking area to assist. (*Id.*)  As soon as the other inmate's search was completed and Sergeant Spring inspected the "'change over area'" for contraband, defendant Farmer ordered plaintiff to his feet so that he could walk to the room in which the search was going to take place. (*Id.*)

When plaintiff refused defendant Farmer's order, defendant Spring reached over to plaintiff with his left hand in an attempt to take hold of plaintiff's right arm in order to assist him to his feet. (*Id.*)  As defendant Spring was reaching toward plaintiff, he felt plaintiff "tense up" and quickly turn toward defendant Spring while swinging his arms

---

[10] The court notes that the video tape does not have an audio track.  Thus, the actual statements by plaintiff are being taken from the defendants' affidavits.  However, the actions on the video tape are consistent with the conversation that is being relayed by the officers.

[11] The video tape clearly shows the other inmate who came into the facility with plaintiff submitting to the proper procedure.  Although the court cannot see the inmate himself because he was placed in a private room out of the camera's view, it is clear that the officer in charge of the search stood outside the room, took the inmate's clothing and placed it on a shelf.  The officer never touched the inmate, and when the "search" was completed, the officer handed the inmate back his clothes, and the inmate came out of the room fully dressed.  He was subsequently escorted away without incident.

"in a manner that made [defendant Spring] think [plaintiff] was trying to strike [him]." (*Id.*) Plaintiff then wrapped his wrist shackle around defendant Spring's left forearm, which caused defendant Spring to fall toward plaintiff and caused plaintiff to fall backward off of the stool, pulling both men onto the ground. (D. Spring Aff. ¶ 6). Defendant Spring states that while the two men were on the ground, despite defendant Spring's orders to stop, plaintiff continued to grab at defendant Spring's hands which caused the chain to rub across his forearm, causing injury to his left arm.[12] (*Id.*)

Plaintiff continued to resist, and defendant Spring states that while he, Sergeant Spring, and Officers Smith and Green attempted to bring plaintiff under control, Officer Barbara Baker retrieved a "restraint chair" from the Sergeant's Office. (*Id.*) When Officer Baker arrived with the chair, defendant Spring assisted the other officers in lifting plaintiff up so he could be brought to the chair. Defendant Spring assisted as plaintiff was secured to the chair. Defendant Spring states that he then left the area so that he could obtain medical help for his injured arm. (*Id.*) Defendant Spring states that he never observed any injury on plaintiff, nor does he remember plaintiff ever complaining about being injured. (D. Spring Aff. ¶ 7).

In his affidavit, Officer Christopher Green states that he was one of the "transport" officers who escorted plaintiff and other inmates to court and back through the booking area on September 10, 2014. Officer Green states that "at some point," he

---

[12] Although the video tape shows plaintiff grabbing for defendant Spring and both men falling onto the floor, they fell behind the scanner, and because of the presence of the additional officers, it is difficult to see exactly what was happening on the floor for a few seconds until plaintiff was dragged out from behind the scanner.

observed plaintiff attempt to break free from defendant Spring "who was trying to escort Inmate Parson to be frisked." (Green Aff. ¶ 4) (Dkt. No. 31-13). Officer Green states that both defendant Farmer and Sergeant Barrett Spring then became involved in the "physical incident." He observed all of the officers on the floor "with the violently struggling [plaintiff]." (*Id.*) Officer Green then went over to assist by restraining plaintiff's lower legs and assisting the other officers in lifting plaintiff so he could be placed in the restraint chair. (*Id.*) Officer Green also states that he never observed any injuries on plaintiff, nor did plaintiff complain about being injured. (Green Aff. ¶ 6).[13] Officer Green states that he did not observe any officer take any inappropriate action toward plaintiff. (*Id.*)

Defendant Sergeant Kevin Smith states that he was also one of the transport officers on September 10, 2014. (Smith Aff. ¶ 4) (Dkt. No. 31-14). He was one of the officers who escorted plaintiff into the booking area, and as they entered the room, he heard plaintiff announce loudly that he would not comply with the strip frisk. (*Id.*) Defendant Smith states that when defendant Spring attempted to take hold of plaintiff's arm in order to escort him to the frisk room, plaintiff "abruptly grabbed Officer Spring's hand," and they "fell to the floor, where [plaintiff] continued to struggle against Officer Spring." (*Id.*) Defendant Smith states that he assisted in attempting to control plaintiff by placing his right knee into plaintiff's "left rib area and used [his] body weight to hold him on the floor" because he was refusing orders to stop resisting,

---

[13] Officer Green's affidavit contains a typographical error. The last paragraph is labeled "6," but it is actually paragraph 5. The court has cited the paragraph the way it is labeled to avoid any confusion.

and he was attempting to get up. (*Id.*) Defendant Smith states that he "immediately removed [his] knee when [plaintiff] stated that he was having trouble breathing." (*Id.*) Defendant Smith states that he used his right hand to assist in controlling plaintiff's right foot. (*Id.*)

Defendant Smith also assisted in placing plaintiff in the restraint chair. (Smith Aff. ¶ 5). He employed "body holds" to plaintiff's left arm and leg to lift him from the floor and place him into the chair. Defendant Smith states that as plaintiff was being secured into the chair, he began to lean his upper torso forward and continued to verbally taunt the staff. Defendant Smith was afraid that plaintiff would attempt to "head butt" or otherwise injure the staff. In order to curtail this forward movement, defendant Smith utilized a "mandible hold" by placing his hands at the corners of plaintiff's mandible area and pulling his head back against the head rest of the chair. He held plaintiff there until the other staff members were able to properly secure him to the chair. (*Id.*) Defendant Smith states that the "mandible hold" is "a technique used in instances such as this where an inmate is being non-compliant with verbal directives." (*Id.*) Defendant Smith states that he only used this hold until plaintiff was secured into the chair, and at that point, he immediately stopped applying force and released plaintiff's mandible area. (*Id.*)

In defendant Sergeant Farmer's affidavit, he states that he was called to the booking area on September 14, 2014 at approximately 10:20 a.m. because plaintiff was "verbally refusing" to submit to the strip search. (Farmer Aff. ¶ 5). Defendant Farmer was present when plaintiff wrapped his shackles around defendant Spring's arm, and

they both fell to the ground. (*Id.*) Defendant Farmer states that he assisted the staff in attempting to gain control over plaintiff and placing him in the restraint chair. When plaintiff had been placed in the chair, Sergeant Spring called the medical department. Within very few minutes, LPN Evelyn and RN Nicole arrived in the booking area and examined plaintiff. Defendant Spring was sent to the medical department for evaluation of the injuries to his forearm. (*Id.*)

Although plaintiff alleges that he was strapped into the chair "for hours" with a bag over his head and very little air to breathe, defendant Gates states that because plaintiff was spitting while in the restraint chair, a "spit mask" was utilized to stop him from spitting on the staff. (Gates Aff. ¶ 9). A spit mask is a finely woven nylon mesh hood which is placed over the head and fact to reduce the amount of sputum expelled by the inmate. (*Id.*) Defendant Gates states that the design of the spit mask is such that it does not prevent airflow. Defendant Gates also states that plaintiff was examined several times during the day by medical personnel. (*Id.*)

This statement is corroborated by the video tape of the incident and the nurses' notes from September 10, 2014 which reflect their subsequent examinations. (Dkt. No. 31-3 at 337). The first entry on September 10, 2014 was at 10:20 a.m. and states that plaintiff was yelling and screaming. His left and right hands were cool to the touch, and the nurse asked Sergeant Farmer to loosen the straps. Sergeant Farmer loosened the straps, and the nurse applied a band-aid to a "small droplet of blood on [plaintiff's] hand." (*Id.*) Plaintiff's ankle straps were appropriately placed, and his pulses were positive.

Plaintiff was examined again at 11:00 a.m. He was still yelling and screaming in the chair. The straps on his wrists and ankles were secure and his pulses were positive with "good capillary refill." He was able to move his fingers and toes without difficulty, and he denied pain. The spit mask was then in place, and he was "cooperative." Plaintiff was examined again at 11:39 a.m. and at 12:10. (*Id.*) Plaintiff was still yelling, and defendant Farmer offered plaintiff the "medical check," to which plaintiff responded: "'Fuck medical, fuck vital signs.'" (*Id.*) Defendant Farmer checked the wrist straps and loosened the one on the left. Plaintiff was offered a "medical check" again, but he "yelled belligerent words." The nurse indicated that she would "continue to monitor." The nurse's notes end at 12:10.[14] Plaintiff was sitting in the chair, yelling, but cooperative with the nurse's attempt to check vital signs. His pulses were normal, and his skin was warm and dry to the touch. The spit mask was in place, and plaintiff denied any pain. There is no indication that he was having trouble breathing.

Although plaintiff conceded that he refused the strip search and made some inappropriate comments to the defendants, his description of the incident in the amended complaint, as well as during his testimony at the 50-h hearing, was not consistent with either defendants' affidavits or the video evidence of the incident. Plaintiff testified at his 50-h hearing that he asked "what happens if I don't strip-search." (HT at 80). He then stated that although he was being "sarcastic," he "stuck to it" and told them that they were going to have to "kill [him]." (*Id.*)

---

[14] The court assumes that this was 12:10 p.m., but there is no indication on the document.

Plaintiff then testified that the defendants "started coming" at him, with "no communication," and when defendant reached for him, he thought that the defendant was coming to take his clothes off, so plaintiff "smacked his hand down and that is when he grabbed me and slammed me on the floor." (HT at 84-85). Plaintiff states that he did not resist after that, but that he was still swearing at them and telling them that he was "still not letting [them] strip search me." (HT at 85). Plaintiff testified that defendant Spring was banging plaintiff's head on the ground, and the officers were twisting his ankle and choking him. (HT at 85, 92) Plaintiff also claimed that defendant Smith continued to choke him for "five to eight" minutes after he was strapped into the chair. (*Id.*) Later in the hearing, plaintiff stated that they hit, twisted, and choked him for ten minutes, and that he had lumps all the way around his forehead. (HT at 92).

The video tape belies all of plaintiff's allegations. It is clear that defendant Spring was only reaching toward plaintiff to assist him in getting up. Defendant Spring was only reaching with one hand, so plaintiff's statement that he thought Spring was "coming at him" to "rip" his clothes off is hard to believe, at best, and it is inconsistent with the video evidence. Plaintiff's statement that once he was on the floor the defendants were banging his head on the floor is also not supported by the video tape. Although in the beginning, it is impossible to see defendant Spring and plaintiff's head because they fell behind the scanning machine, all the officers were very still as they were trying to control different parts of plaintiff's body. Plaintiff claims that his ankle was being twisted, but instead the video shows that his leg was being held still. Defendant Smith concedes that he placed his knee in plaintiff's rib area to make sure

that he was not moving, but that when plaintiff complained that he was having trouble breathing, Officer Smith removed his knee.

Plaintiff's claim that he was choked for five or six to eight minutes after he was placed in the chair is not supported by the video and is impossible based on the fact that the entire incident took approximately six minutes from plaintiff pulling defendant Spring to the floor to when the nurses came to examine plaintiff, and he was wheeled into the next room. The incident started at 10:13:18 a.m. By 10:16:47, plaintiff was already secured in the chair, and at 10:19:00, plaintiff was wheeled into the next room, which had a window to the booking area, and plaintiff's head could be seen through the window. This is corroborated by the nurses' notes, indicating that they first examined plaintiff at 10:20 a.m. (Dkt. No. 31-3 at 337).

In addition, it is also apparent that defendants were not "choking" plaintiff while he was in the restraint chair. Defendant Smith states that he used a "mandible hold" because he was worried that plaintiff was going to injure one of the officers with his head. The video shows an officer holding the sides of plaintiff's jaw, consistent with defendant Smith's description of a "mandible hold." Plaintiff's characterization of this method of restraint as "choking" is inconsistent with the video.

Plaintiff characterizes the "spit mask" as a "bag" over his head, making it difficult to breathe. However, plaintiff never complained to the nurses who were examining that he had any pain or any problem breathing. The court notes that notations were made about the tightness of the straps, and the straps were loosened accordingly. At least two of the nurses' notes mention the spit mask. Thus, plaintiff's

allegation that he had trouble breathing because of the mask is belied by his own behavior. In his affidavit, defendant Gates notes that on September 11, 2014, plaintiff filed a grievance regarding this incident. (Gates Aff. ¶ 10). Although in his grievance, he did say that the spit mask restricted his ability to breathe, he conceded that he was spitting at the time that they placed the mask on him.[15] Defendant Gates quotes the grievance: "I had nowhere to spit so I spit on the wall at which point Sgt. Farmer placed a protective mask over my head restricting my ability to breathe."[16] (*Id.*) (citing Grievance # 2014-1053). Plaintiff also filed a grievance, complaining that he was not aware of the strip search procedures, and on September 10, 2014, he was surrounded by men putting on gloves, and he feared that he would be "physically forced to strip." (Dkt. No. 31-3 at 126).

With respect to the specific *Hudson* factors cited above, this court first finds that

---

[15] The placement of the mask does not appear on the video. The records indicate that the spitting occurred at approximately 10:58. (Dkt. No. 31-3 at 109) (Unusual Incident Report dated Sept. 10, 2014). Officer Richard Graham, who was not involved in the incident and is not a defendant in this case, states that after he was placed in the restraint chair, plaintiff was put in a "holding cell." Officer Graham was assigned to watch plaintiff, and at 10:58, plaintiff "spit on the." (*Id.*) The report also indicates that plaintiff was "removed from the chair" at 12:36, placed in another cell, and "given chow." (*Id.*) Plaintiff's allegation that he was kept in the chair for "hours" is also an exaggeration. Thus, to the extent that the complaint may be interpreted as a "conditions" of confinement claim in addition to an "excessive force" claim, it is meritless because plaintiff was only in the mask and the restraint chair for approximately one and one half hours, and a nurse examined him every half hour to make sure that he was not in any discomfort or pain. As stated above, there is absolutely no indication that plaintiff was having trouble breathing, and he denied any pain or discomfort each time he was examined. (*Id.* at 337).

[16] Plaintiff was charged with spitting on the wall in a misbehavior report. (Dkt. No. 31-3 at 111-12). Plaintiff continued to cause problems in the facility. Notwithstanding the incident on September 10, 2014, the next day, and the day after that, he was again swearing at the officers and refusing to obey orders. (*Id.* at 121, 122). The court also notes that plaintiff consistently waived his rights to disciplinary hearings regarding his misbehavior and clearly did not care that he was being sanctioned for his actions. (*See e.g. id.* at 107, 120, 124).

plaintiff's lack of injury is not dispositive, but, the extent of plaintiff's injury is one factor to consider in analyzing the "subjective element." Plaintiff's injury, if any, was de minimis. The nurse only applied a band-aid to plaintiff's hand, and noted that plaintiff denied any pain each time he was examined. With respect to the subjective element, it is clear that force was applied, but only in an effort to control plaintiff's violent conduct and restore order and discipline.

Based upon plaintiff's tirade about refusing to be searched, and his statement that they would have to "kill" him first, coupled with plaintiff's history of violent behavior, including a recent assault on a female officer, the defendants' were understandably expecting an outburst from plaintiff. All the defendants noted that once plaintiff pulled the two officers to the ground, he continued to struggle, and the rest of the officers were needed to control his behavior. It is apparent from the video tape that the force used was appropriate for the situation, and given plaintiff's implication that the officers would have to "kill" him before he submitted to a search, the defendants could reasonably have perceived a threat of violence by plaintiff. Finally, the defendants appear to have made an effort to simply subdue plaintiff and place him in the restraint chair. Defendant Smith's use of the mandible hold was appropriate, given plaintiff's attempt to lean forward and defendant Smith's fear that plaintiff would try to head-butt one of the officers as they were trying to secure plaintiff to the chair. Defendant Smith released plaintiff's head as soon as he was secured to the chair. Thus, the officers made an effort to temper the severity of their response and restore order as quickly as possible. This is shown by the short period of time that expired between the start of the

incident and plaintiff being placed in the chair.

The spit mask was applied because plaintiff admittedly spit on the wall. The fact that plaintiff appears to have had a reason[17] for doing so does not change the fact that he was perceived as spitting at the officers. Finally, the plaintiff was examined every half hour by the nurses, and notwithstanding his statement that he was in the chair for "hours," it is clear from the documents submitted that he was in the chair for approximately one and one half hours. He was then released and given "chow." Thus, the defendants have shown that their actions were reasonable and not characterized by "wantonness."

Based on the above, this court finds that defendants have established that they are entitled to judgment as a matter of law, and plaintiff has failed to create a factual issue, sufficient to survive summary judgment. In view of the video and documentary evidence provided by defendants, this is a case in which plaintiff's claims are both (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Jeffreys v. City of New York*, 426 F.3d at 554-55. Plaintiff has failed to respond to the defendants motion and thus admits the facts as stated by defendants. This court must recommend granting summary judgment in defendants favor.

---

[17] Plaintiff's "reason," as he stated in one of his grievances, was that he had no place to spit, so he spit on the wall. (Gates Aff. ¶ 10) (citing Grievance # 2014-1053).

# V.     Failure to Protect

## A.     Legal Standards

An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991) (citation omitted).  An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of others states a claim under section 1983. *Id.* at 113.  As stated above, this case is being analyzed under the Fourteenth Amendment, but the standards are the same.

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety.  *Id.* at 837.  The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference.  *Id.*

## B.     Application

Although I have found that no excessive force took place, I will address any claims against defendant Gates, who was not present during the incident.  Plaintiff alleges that defendant Gates arrived "forty-five" minutes "later." (AC at 3).  Plaintiff appears to allege that when defendant Gates arrived, he ignored plaintiff's complaint about the spit mask.  To the extent that the amended complaint can be interpreted to

allege that defendant Gates failed to protect plaintiff from the alleged "excessive force," plaintiff has not alleged that defendant Gates was aware that plaintiff faced any risk of serious harm, or disregarded any such knowledge. Plaintiff's attempt to claim that. later on September 10, 2014, defendant Gates was involved in the assault of another inmate does not support plaintiff's claims. (AC at 3-4). Any allegation of a "policy" is belied by the video tape of the previous inmate undergoing a strip search with absolutely no problem and no contact or use of force by the officer supervising the search.

In addition, the documents do not indicate that plaintiff was complaining about the spit mask at any time. Thus, to the extent that defendant Gates stopped by to check on the plaintiff after the incident, there is no indication that he "ignored" plaintiff's complaints about anything. Therefore, defendants have shown that there is no genuine issue of material fact, and plaintiff has not raise such an issue in his amended complaint. He did not respond to the summary judgment motion, thus, the facts as established by the defendants are not contested.[18]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 31) be **GRANTED** and the amended complaint **DISMISSED IN ITS ENTIRETY**, and it is

---

[18] The defendants have also included an argument, addressing their claim of qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because I have found no constitutional violation, I need not address qualified immunity.

**RECOMMENDED**, that the defendants' motion to have this court grant summary judgment as unopposed (Dkt. No. 34) be **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 17, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge